**James Charles KIAK, Appellant**

v.

**CROWN EQUIPMENT CORPORATION, Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 24, 2009.

Filed Jan. 29, 2010.

Peter M. Patton, Philadelphia, for appellant.

William J. Conroy, Wayne, for appellee.

BEFORE: FORD ELLIOTT, P.J.,
MUSMANNO, ORIE MELVIN *,
BENDER, BOWES, PANELLA,
DONOHUE, SHOGAN and ALLEN, JJ.

OPINION BY MUSMANNO, J.

¶ 1 James Charles Kiak ("Kiak") appeals from the Order of the trial court granting summary judgment in favor of Crown Equipment Corporation ("Crown") in this product liability action. The trial court concluded that this case is controlled by the decision of a panel of this Court in *Arnoldy v. Forklift L.P.*, 927 A.2d 257 (Pa.Super.2007), and the principles of federal preemption. In *Arnoldy*, a panel of this Court concluded that the Occupational Safety and Health Act of 1970 ("OSH Act"), 29 U.S.C.A. §§ 651 *et seq.*, and regulations adopted pursuant to the OSH Act, preempted a similar state tort law claim. We hereby overrule *Arnoldy*, reverse the Order of the trial court and remand for further proceedings.

¶ 2 The trial court summarized the salient facts underlying the instant appeal, as set forth in the pleadings and exhibits, as follows:

> At all relevant time[s], [Kiak] was employed by Victualic Co. America, a foundry located in Easton, Pennsylvania, which manufactures couplings to join pipes for sprinkler systems and fire protection. On November 4, 1998, while at the job-site, [Kiak] was injured when a Crown 30TSP Series Turret Stockpicker Truck (TSP), a type of forklift[,] which was being operated by a coworker, pinned [Kiak] between two boxes and nearly amputated his foot. Although the TSP forklift was equipped with a functioning back-up travel alarm and a strobe light, [Kiak] claims that he was unaware that the forklift was near him until it was a few feet away, and he was unable to get out of its way. [Kiak]

> further claims that the forklift's back-up travel alarm was defective because the travel alarm did not sound when the forklift coasted backwards while in neutral.

> The TSP forklift involved herein was manufactured in 1997 by [Crown], and was one (1) of eight (8) 30TSP series forklifts sold to [Kiak's] employer in 1998. According to its description, the 30TSP series forklift, which is approximately twenty-one (21) feet high, ten (10) feet long and five (5) feet wide, is an award winning turret-style forklift specially designed for moving three thousand (3,000) pound palletized loads to a height of thirty-five (35) feet in a high density warehouse environment. The TSP Forklift's maximum speed is six (6) miles per hour and, depending on the height of the forks, the speed will decrease to one (1) mile per hour.

> [Crown] contends that when [Kiak's] employer ordered its fleet of TSP forklifts, there were numerous options available designed to customize the forklifts to the user's operational needs and the specific work environment. These options included not only performance-related items, such as tire and guidance systems, but also safety-related items, such as audible back-up travel alarms. [Crown] avers that [Kiak's] employer customized the TSP forklifts by adding an audible back-up travel alarm specifically designed to sound when the operator moved the throttle into reverse and stop sounding when the throttle was placed in the neutral or forward positions, regardless of the forklift's actual travel direction.

Trial Court Opinion, 2/29/08, at 2.

¶ 3 Kiak filed a Civil Complaint against Crown and Omnilift, Inc. ("Omnilift"), on

* Judge Orie Melvin did not participate in the consideration or decision of this case.

October 24, 2000. In his Complaint, Kiak alleged causes of action in negligence, breach of warranty and strict product liability.[1] Kiak's product liability claim alleged a defectively designed back-up travel alarm system on the TSP forklift. Complaint, 10/24/00, at ¶¶ 32–36. Prior to trial, Kiak withdrew his negligence and breach of warranty claims. Kiak also settled his case against Omnilift. Thus, the case proceeded on Kiak's sole remaining cause of action against Crown: strict product liability.

¶ 4 On February 4, 2003, following a trial, the jury returned a verdict in favor of Crown. Kiak filed a post-trial Motion challenging the trial court's refusal to give two proposed jury instructions. The trial court denied the post-trial Motion. Thereafter, Kiak appealed the judgment in favor of Crown to this Court. On appeal, this Court vacated the verdict and remanded the case for a new trial. *Kiak v. Crown Equip.*, 894 A.2d 829 (Pa.Super.2005). The Pennsylvania Supreme Court denied Crown's subsequent Petition for allowance of appeal. *Kiak v. Crown Equip. Corp.*, 591 Pa. 665, 916 A.2d 634 (2006).

¶ 5 On remand, Crown filed a Motion for summary judgment asserting that this case is controlled by the Pennsylvania Superior Court's panel decision in *Arnoldy*. On October 17, 2007, the trial court agreed and entered summary judgment in favor of Crown. Thereafter, Kiak filed the instant timely appeal. On February 17, 2009, a panel of this Court filed a decision reversing the Order of the trial court and remanding for further proceedings. This Court subsequently withdrew the panel decision and granted reargument *en banc*.

¶ 6 Kiak presents the following claims for *en banc* review by this Court:

I. Whether the trial court erred in relying on *Arnoldy* where the *Arnoldy* court failed to consider the effect of the OSH Act's savings clause which operates to save [Kiak's] claim from preemption?

II. Whether the trial court erred in failing to acknowledge that [Kiak's] claim was not preempted through the effect of the [the OSH Act's] savings clause, which has been near universally construed to save injured employees['] state tort claims against the suppliers of a defective product[ ]?

III. Whether the trial court erred in finding [Kiak's] claim was preempted by federal law when the federal regulation cited by the trial court contains advisory language which is not and cannot be part of federal law?

IV. Whether the trial court erred in finding [that Kiak] failed to establish causation despite [Kiak's] evidence that he would have heeded a backup alarm if the subject Crown TSP [forklift] had a warning that sound[ed] while coasting in reverse?

Brief for Appellant at 4 (issues renumbered for disposition).

¶ 7 Kiak challenges the trial court's entry of summary judgment against him and in favor of Crown. Kiak's first three claims basically challenge the trial court's application of this Court's panel decision in *Arnoldy* and the court's conclusion that the OSH Act preempted Kiak's state tort claim. As the trial court stated in its Opinion, the issue is "whether the law of [federal] preemption precludes this action." Trial Court Opinion, 2/29/08, at 6. The trial court determined that, applying this Court's panel decision in *Arnoldy*, federal law preempts Kiak's cause of action.

---

1. Since *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966), the Pennsylvania Supreme Court has recognized a plaintiff's right to pursue an action in strict liability against the manufacturer of a product pursuant to section 402A of the Restatement (Second) of Torts.

¶ 8 The Pennsylvania Rules of Civil Procedure instruct that a trial court shall enter summary judgment when there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. Pa.R.C.P. 1035.2(1); *Weaver v. Lancaster Newspapers, Inc.*, 592 Pa. 458, 926 A.2d 899, 902 (2007). When, as here, the issue raised on appeal presents a question of law, our standard of review is *de novo* and our scope of review is plenary. *Dooner v. DiDonato*, 601 Pa. 209, 971 A.2d 1187, 1193 (2009).

¶ 9 Kiak claimed that Crown was strictly liable based upon an alleged design defect in the forklift. Kiak's Complaint at ¶ 35. Strict liability allows a plaintiff to recover where a product in "a defective condition unreasonably dangerous to the user or consumer" causes harm to the plaintiff. Restatement (Second) of Torts Section 402A; *Webb*, 220 A.2d at 854 (adopting Section 402A). At issue is whether the OSH Act preempts Kiak's strict liability claim.

¶ 10 Federal preemption is a jurisdictional matter for a state court because it challenges subject matter jurisdiction and the competence of the court to reach the merits of the claims raised. *Werner v. Plater–Zyberk*, 799 A.2d 776, 787 (Pa.Super.2002). The principle of federal preemption of state law derives from the second clause of Article VI of the United States Constitution's Supremacy Clause, which provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, laws that are in conflict with federal law are "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981).

¶ 11 "Congress has the undisputed power to preempt state law in areas of federal concern." *Stone Crushed P'ship v. Jackson*, 589 Pa. 296, 908 A.2d 875, 880 (2006). In determining the breadth of a federal statute's preemptive effect on state law, courts are guided by the tenet that "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, —— U.S. ——, 129 S.Ct. 1187, 1194, 173 L.Ed.2d 51 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). However, "because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly preempt state-law causes of action." *Medtronic, Inc.*, 518 U.S. at 485, 116 S.Ct. 2240. From this premise, the Supreme Court has relied upon an "assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).

¶ 12 The presumption against federal preemption of state law is one of "dual jurisdiction" which "results from reasons of comity and mutual respect between the two judicial systems that form the framework of our democracy." *Fetterman v. Green*, 455 Pa.Super. 639, 689 A.2d 289, 292 (1997) (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) and *Michael v. Shiley, Inc.*, 46 F.3d 1316 (3d Cir.1995)). As our sister court, the Commonwealth Court of Pennsylvania, succinctly explained, "There is no hierarchical arrangement between state courts and federal courts that exercise jurisdiction within that state. Under the federal system, the states possess sovereignty concurrent with that of the federal government." *Werner*, 799 A.2d at 788 (quoting *City of Philadel-*

*phia v. Pennsylvania PUC,* 676 A.2d 1298, 1309 n. 10 (Pa.Cmwlth.1996)).

■ ¶ 13 Congress's intent to preempt state law may be express or implied and found in any of three ways:

First, state law may be preempted where the United States Congress enacts a provision which expressly preempts the state enactment. Likewise, preemption may be found where Congress has legislated in a field so comprehensively that it has implicitly expressed an intention to occupy the given field to the exclusion of state law. Finally, a state enactment will be preempted where a state law conflicts with a federal law. Such a conflict may be found in two instances, when it is impossible to comply with both federal and state law[ ] or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*In re Estate of Sauers,* 971 A.2d 1265, 1269 (Pa.Super.2009), *appeal granted,* 981 A.2d 1279 (Pa.2009) (quoting *Stone Crushed P'ship v. Kassab Archbold Jackson & O'Brien,* 589 Pa. 296, 908 A.2d 875, 881 (2006) (citations omitted), in turn quoting *Office of Disciplinary Counsel v. Marcone,* 579 Pa. 1, 855 A.2d 654, 664 (2004)).

¶ 14 Congress passed the OSH Act in 1970 with the declared purpose "to assure so far as possible every working man and woman in the nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C.A. § 651(b). One of the means to this end was "authorizing the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce." 29 U.S.C.A. § 651(b)(3). Through this legislation, the federal government entered into a field that traditionally had been occupied by the states. *Gade v. Nat'l Solid Wastes*

*Mgmt. Ass'n,* 505 U.S. 88, 96, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992).

■ ¶ 15 The federal entry was not uniform or comprehensive, however, as the statute also provided that states could submit to the Secretary of Labor their own occupational safety and health standards to supplant the federal standards. 29 U.S.C.A. § 667(b). Further, the statute reserved to the states the power to enact occupational safety and health laws in areas in which no federal standard exists. 29 U.S.C.A. § 667(a). OSH Act section 667 precludes "any state regulation of an occupational safety or health issue with respect to which a federal standard has been established, unless a state plan has been submitted and approved." *Gade,* 505 U.S. at 102, 112 S.Ct. 2374. However, by including a so-called "savings clause," Congress expressly carved out of its preemption rules state common law and statutory tort remedies, such as the tort claim now raised by Kiak:

Nothing in this chapter shall be construed to supersede or . . . to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.

29 U.S.C.A. § 653(b)(4).

¶ 16 The United States Supreme Court has discussed the interplay between analogous saving and preemption clauses, concluding that the preemption clause should be read narrowly:

Without the saving clause, a broad reading of the express pre-emption provision arguably might pre-empt those actions, for, as we have just mentioned, it is possible to read the pre-emption provision, standing alone, as applying to

standards imposed in common-law tort actions, as well as standards contained in state legislation or regulations. And if so, it would pre-empt all nonidentical state standards established in tort actions covering the same aspect of performance as an applicable federal standard, even if the federal standard merely established a minimum standard. On that broad reading of the pre-emption clause little, if any, potential "liability at common law" would remain. And few, if any, state tort actions would remain for the saving clause to save. We have found no convincing indication that Congress wanted to pre-empt, not only state statutes and regulations, but also common-law tort actions, in such circumstances. Hence the broad reading cannot be correct. The language of the pre-emption provision permits a narrow reading that excludes common-law actions. Given the presence of the saving clause, we conclude that the pre-emption clause must be so read.

*Geier v. American Honda Motor Co.,* 529 U.S. 861, 868, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000).

¶ 17 The sparse legislative history of the OSH Act leaves little doubt that 29 U.S.C.A. § 653(b)(4) evinces a congressional intent to preserve state tort law from preemption. In a letter to the Chairman of the House Subcommittee on Labor, the Solicitor of Labor explained that the OSH Act "would in no way affect the present status of the law with regard to workmen's compensation legislation or private tort actions." Occupational Health and Safety Act of 1969: Hearings on H.R. 843, H.R. 3809, H.R. 4294, and H.R. 13373 before Select Subcomm. on Education and Labor, 91st Cong., 1st Sess., Pt. 2, at 1592–93 (letter of L.H. Silberman, Solicitor of Labor). Having found no express federal

preemption, we next determine whether field preemption exists.

¶ 18 Field preemption occurs "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Gade,* 505 U.S. at 98, 112 S.Ct. 2374 (citation and internal quotation marks omitted). The OSH Act provides, in pertinent part, the following:

> Any State which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated ... shall submit a State plan for the development of such standards and their enforcement.

29 U.S.C.A. § 667(b). The OSH Act further provides that

> [n]othing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under section 655 of this title.

29 U.S.C.A. § 667(a). The above provisions clearly demonstrate the intent of Congress to allow states a role in maintaining safe and healthful working conditions. Thus, field preemption is not applicable.

¶ 19 The remaining issue is whether conflict preemption exists. Conflict preemption occurs where "compliance with both federal and state regulations is a physical impossibility," or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade,* 505 U.S. at 98, 112 S.Ct. 2374 (citation omitted).

¶ 20 In *Cellucci v. GMC*, 550 Pa. 407, 706 A.2d 806, 811 (1998), our Pennsylvania Supreme Court recognized that common law liability will survive federal regulations promulgated pursuant to the OSH Act, so long as the only basis under which the common law liability is claimed does not prevent a manufacturer from complying with the federal regulation in a manner of its choosing. *Id.* at 810 (citation omitted). To hold otherwise would place manufacturers "in a position where they could be subject to varying standards from state to state, which could not all be complied with simultaneously." *Id.* at 811 (citation omitted).

¶ 21 The regulations promulgated pursuant to the OSH Act provide, in relevant part, the following:

§ 1910.178 **Powered industrial trucks.**

(a) General requirements.

(1) This section contains safety requirements relating to fire protection, design, maintenance, and use of fork trucks, tractors, platform lift trucks, motorized hand trucks, and other specialized industrial trucks powered by electric motors or internal combustion engines. This section does not apply to compressed air or nonflammable compressed gas-operated industrial trucks, nor to farm vehicles, nor to vehicles intended primarily for earth moving or over-the-road hauling.

(2) All new powered industrial trucks acquired and used by an employer shall meet the design and construction requirements for powered industrial trucks established in the "American National Standard for Powered Industrial Trucks ["ANSI"], **Part II,** ANSI B56.1–1969", which is incorporated by reference as specified in § 1910.6, except for vehicles intended primarily for earth moving or over-the-road hauling.

29 C.F.R. § 1910.178 (emphasis added).

¶ 22 The ANSI provision referenced in the OSH Act regulations contains three parts. Part I is the introduction, Part II is for the manufacturer, and Part III is for the user. *See* ANSI B56.1–1969. Section 1910.178 requires powered industrial trucks to meet the design and construction requirements established in Part II.

¶ 23 Part II of ANSI B56.1–1969 provides the following standard regarding audio alarms:

Every truck or tractor shall be equipped with a warning horn, whistle, or gong, or other device.

ANSI B56.1–1969, at § 427. The section provides no other standard applicable to audible warning devices.[2]

2. Unlike the federal statute determined to preempt state tort law in *Geier* and *Cellucci,* the regulation at issue in this case does not place responsibility upon the user to determine what warning devices are necessary, nor does it direct the manufacturer to choose between different options to satisfy the safety requirement. Accordingly, the rationale of the United States Supreme Court expressed in *Geier* and *Cellucci* is not applicable in the instant case. In addition, as expressed by the United States District Court in *Santos v. Crown Equip. Corp.,* 2009 WL 1066946, *5, 2009 U.S. Dist. LEXIS 34159, *13 (S.D. Fla. April 21, 2009), the fact that applicable federal regulations neither prohibit nor require the inclusion of a backing alarm that sounds while the forklift coasts backwards does not mean that Crown's decision not to include such an alarm constituted, as in *Geier,* an election of an agency-approved option immune from any standards potentially imposed by state tort law.

If that were the case-if all of the manufacturer's decisions regarding design elements not addressed in federal regulations were considered in this sense "federally approved"—then all state—law tort claims against OSHA–compliant vehicles would be preempted. Effectively, this would mean that all OSHA regulations are intended to "occupy the field" and that all state-law

¶ 24 In *Arnoldy,* a panel of this Court correctly found that that ANSI B56.1–1969 Part II is the applicable standard governing forklifts. However, the *Arnoldy* court then determined that Section 514 of ANSI B56.1–1969 preempted the plaintiffs' state tort claim. Contrary to the panel's holding in *Arnoldy,* Section 514 is not contained in ANSI B56.1–1969 Part II. Rather, it is contained in ANSI B56.1–1969 **Part III**. The federal regulation does not incorporate by reference ANSI B56.1–1969 Part III.

¶ 25 The regulation's preamble expressly recognized that the federal regulation did not incorporate advisory standards promulgated by ANSI. The Secretary of Labor stated the following regarding the adoption of 29 C.F.R. § 1910:

> I do hereby designate as national consensus standards those standards in Part 1910 which are standards adopted and promulgated by either the [ANSI] or the National Fire Protection Association (NFPA). **The national consensus standards contain only mandatory provisions of the standards promulgated by those two organizations.** The standards of ANSI and NFPA may also contain advisory provisions and recommendations the adoption of which by employers is encouraged, but they are not adopted in Part 1910.

OSH Administration Final Rule, Federal Register 68:32637–32638 (emphasis added).

¶ 26 Thus, 29 C.F.R. § 1910.178 does not incorporate the advisory provisions of ANSI B56.1–1969 Part III, including Section 514. Because *Arnoldy* based its decision regarding federal preemption on Section 514, an inapplicable ANSI standard, we conclude that *Arnoldy* was wrongly decided and overrule *Arnoldy* on that basis.

¶ 27 Upon examination of the federal statute, regulations and *applicable* ANSI standards, we conclude that Kiak's product liability theory suggests a standard that is not in conflict with or preempted by federal law. Kiak's product liability theory asserted that a design defect caused the absence of the appropriate automatic audible signal on the forklift. Complaint at ¶¶ 12, 28, 31, 32–36. Kiak asserted that the manufacturer "supplied the [forklift] in a defective and/or unreasonably dangerous condition in light of the design defect, set forth above, in that the [forklift] had elements which made it unsafe for use and was without elements required to make it safe for use. . . ." *Id.* at ¶ 35.

¶ 28 Kiak alleged a defect based upon the alarm's failure to sound when the forklift's throttle is disengaged while coasting backwards, resulting in a failure to warn pedestrians that a forklift was approaching in reverse. We cannot conclude that Kiak's proposed standard, *i.e.,* that a backing alarm sound while the vehicle is coasting backwards, imposes a standard in conflict with the federal statute and its accompanying regulations and standards. Specifically, Kiak's proposed standard does not conflict with the requirement that a manufacturer equip forklifts with "a warning horn, whistle, or gong, or other device." *See* ANSI B56.1–1969 Part II. As there is no conflict between state and federal law in this instance, we conclude as a matter of law that federal law does

claims in areas within [the OSH Act's] jurisdiction are therefore subject to implied preemption. This is not so. *See, e.g., Environmental Encapsulating Corp. v. City of New York,* 855 F.2d 48, 58–59 (2d Cir.1988).

*Santos,* 2009 WL 1066946, *5, 2009 U.S. Dist. LEXIS 34159, *13.

not preempt Kiak's cause of action against Crown for strict product liability.

■ ¶ 29 In his fourth claim, Kiak asserts that the trial court erred in granting Crown's Motion for summary judgment because he had established causation. In its Motion for summary judgment, Crown had alleged that Kiak's claims fail against Crown as a matter of law

> [b]ecause [Kiak's] defect theory is based solely on the unsupported assumption that [Kiak] would have heeded a different type of travel alarm, which is pure speculation, and contradictory of his trial testimony that undeniably established that (1) [Kiak] knew Mr. Hissim's [forklift] was at the opposite end of the aisle from where [Kiak] was working; (2) [Kiak] knew that Mr. Hissim was going to use his [forklift] for work that morning; (3) [Kiak] heard backup alarms while he was consolidating boxes; and (4) [Kiak] did not stop what he was doing to look up to see if the alarm was from Mr. Hissim's [forklift] which crashed into the boxes injuring him.

Crown's Motion for Summary Judgment at ¶ 14 (citation omitted).

¶ 30 The trial court's Order granting summary judgment renders no specific ruling on this issue, and the issue is not addressed in the trial court's Opinion. Rather, the trial court deemed the issue moot based upon the federal preemption of Kiak's cause of action. However, because this issue is one of law and our review is *de novo*, we will address the merits of this claim.

¶ 31 In order to survive summary judgment, a plaintiff must present evidence to create a question of material fact on each element of the claim. *Barnish v. KWI Bldg. Co.*, 980 A.2d 535, 547 (Pa.2009). "In a strict liability cause of action, the plaintiff must present evidence of a defect, evidence that the defect caused the injury, and evidence that the defect existed at the time the product left the manufacturer's control." *Id.*

¶ 32 The evidence presented to the trial court reflects that Crown supplied Kiak's employer with a forklift that included an audible travel alarm. Crown's Motion for Summary Judgment, Exhibit "B" (Crown Installation Report/Warranty Registration). The travel alarm was designed to begin sounding when the operator moved the throttle into reverse and stop sounding when the throttle was placed in the neutral or forward position, regardless of the forklift's actual travel direction. *Id.* at Exhibit "C", pg. 55; Exhibit "E", pgs. 10–12, 42.

¶ 33 The forklift included a wire guidance system to steer the forklift, thereby eliminating the need for the operator to look in the direction of travel in order to steer. Kiak's Response to Motion for Summary Judgment, Exhibit "M", at pg. 149. The forklift operators at Kiak's facility frequently coasted the forklifts in reverse, and during those maneuvers, the backing alarm did not sound. *Id.* at 151.

¶ 34 Kiak's expert, Paul Stephens ("Stephens"), opined that the manner in which the forklifts were operated rendered it necessary to have a safety feature whereby the alarm system would continuously sound while backing up. *Id.* at 149. Stephens testified that because the forklift lacked this feature, it was unsafe. *Id.*

¶ 35 Kiak presented testimony by expert Stephen Wilcox, Ph.D. ("Wilcox") defining the phenomenon of habituation as it applies to backup beepers. Habituation "is the phenomenon that you gradually lose your awareness of something when you have been around it for a long time." *Id.*, Exhibit "B," at pg. 32. Wilcox stated that that the phenomenon of "habituation" does not apply to backup beepers. *Id.* According to Wilcox, "[i]f a forklift is silent, it is

going to be more likely *not* to be noticed in time to get out of the way." *Id.*, Exhibit "B", at pgs. 32–33 (emphasis added). Wilcox further stated the following:

> [B]ased on that scenario, then [the forklift] coasted for about 75 feet without any sound, without any sound that could reliably be heard, put it that way. And I believe strongly that if it had had a signaling device, that in that 75 feet, somewhere in that 75–feet distance, that [Kiak] would have heard it coming and he would have had plenty of time to get out of the way.

*Id.*, Exhibit "B", at pg. 43.

¶ 36 On the morning of the accident, Kiak heard the forklift's alarm sounding "at a distance." *Id.*, Exhibit "A", at pg. 111. Immediately prior to the accident, although Kiak saw the forklift, he did not hear an alarm or sounds. *Id.* at 50–51. At the time he saw the forklift, it was a couple of feet from a box, which the forklift then struck. *Id.* at 112. That box then ran into another box, which in turn pinned Kiak between that box and a third box, thereby injuring Kiak. *Id.* at 51, 54–56.

¶ 37 The forklift driver testified that he believed that his hand was not on the throttle and that he was reviewing his paperwork, while backing the forklift down the aisle, at the time of the crash. Crown's Motion for Summary Judgment, Exhibit "H", at pg. 88–89. Expert Stephens opined that the design of the forklift caused Kiak's injuries. Crown's Motion for Summary Judgment, Exhibit "H", at pg. 190.

¶ 38 The above evidence established a substantial question of material fact regarding whether the alleged design defect caused Kiak's injuries. We conclude as a matter of law that Kiak's evidence was sufficient to establish a substantial question of material fact regarding causation

and accordingly, summary judgment in favor of Crown is not warranted.

¶ 39 Order reversed; case remanded for trial; Superior Court jurisdiction relinquished.