In the Interest of A.M.

Timothy J. Holman, for petitioner A.M.

Scudder G. Stevens, for respondent Chester Co. Dept. of Aging Services.

TUNNELL, J., May 20, 2013—Rule 1925(b) allows the trial court to enter an order directing the appellant to file of record in the trial court a concise statement of the errors complained of on appeal.

In this case, the appellant, A.M., has assigned 53 errors over seven pages, which certainly "hinder[s] the trial court in its preparation of legal analysis," *Caln Nether Company, L.P. v. Board of Supervisors of Thornbury Township,* 840 A.2d 484, 490 (Pa. Cmwlth. 2004), observing that Pa. R.A.P. 1925 is intended to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal. Rule 1925 is thus a crucial component of the appellate process. *Id.*

Rule 1925(b)(4)(iv) cautions that the statement should not be redundant. It provides that "[w]here non-redundant, non-frivolous issues are set forth in an appropriately concise manner, the number of errors raised will not alone

be grounds for finding waiver." The explanatory note follows by observing that this rule is "meant to encourage appellants to use the Statement as an opportunity to winnow the issues . . ." *Note: Subdivision (b)*. While statements of matters complained of on appeal must be detailed enough that the judge can write an opinion, they must not be so lengthy that it does not meet the goal of narrowing down the issues previously raised to the few that are likely to be presented to the appellate court without giving the trial judge volumes to plow through. *Arnoldy v. Forklift, L.P.*, 927 A.2d 257 (Pa. Super. 2007), overruled on other grounds by *Kiak v. Crown Equipment Corp.*, 989 A.2d 385 (Pa. Super. 2010).

A.M.'s concise statement is not concise. It is tedious and prolix. Fortunately, it is so redundant that the errors claimed may be grouped as follows:

A. Conclusory statements of error indicating disagreement with the court's order as a whole. These include errors numbered 1, 2, 4, 30, 33, 35, 40, 42, 43, 47, 49, 52 and 53.

EXAMPLE: "53. Erred in not vacating the prior orders of January 24, 2013, January 25, 2013, February 4, 2013 and February 5, 2013 as there was no record in support of emergency relief, no service of any petition/motions on appellant and no record of clear and convincing evidence in support of said orders."

Because of their conclusory nature, the court will address these *in passim*.

B. Evidentiary Rulings

3, 5, 14 — not taking testimony from A.M.

5, 23, 38 — taking testimony from the investigator, Douglas Bernard.

17 — admitting hearsay and non-authenticated documents into evidence.

19, 21, 24, 48 — taking into account the medical record of Dr. Priem

9, 20 — not allowing A.M. to cross-examine any experts or present evidence of her own.

29, 31, 42, 50 and 51 — not holding a hearing to put the respondent agency "to its proofs".

EXAMPLE: "9. Erred in not scheduling a hearing and testimony/evidence by and on behalf of appellant regarding appellant's emergency petition and prior to the court's order of March 19, 2013."

Many of these will be discussed in D. below.

C. Unintelligible Errors

46, 47

D. Specific Errors

18. "Erred in admitting records and/or reports in violation of appellant's HIPPA [sic] rights and her revocation of released records."

Presumably, A.M. is referring to the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. section 300(gg), section 1320(d) ("HIPAA"), which severely restricts the disclosure of medical information. The Privacy Rule is contained within 45 C.F.R. 160.103, et seq. A.M. is wrong for three reasons. First, the reach of the Privacy Rule is only to a "covered entity." Covered entities are three specific groups: Healthcare Providers (doctors, clinics, psychologists, dentists, nursing homes, pharmacies), Health Plans (medical, dental and vision plans, HMOs,

Medicare and Medicaid, long-term care insurers, company health plans), and Healthcare Clearing Houses (billing services, health management information systems, re-pricing companies).

Clearly, a protective services agency is not a covered entity.

Secondly, HIPAA explicitly permits disclosures by covered entities of protected health information about an individual whom the covered entity reasonably believes to be a victim of abuse, neglect or domestic violence "to a government authority, including a social service or protective services agency, authorized by law to receive reports of such abuse, neglect or domestic violence...." 45 C.F.R. §164.512(c)(1). Under Pennsylvania's Older Adult Protective Services Act, the agency is to have access to all relevant records. 35 P.S. §10225.304. Indeed, it must be able to receive reports of older adults in need of protective services 24 hours a day, 7 days a week. Section 10225.302(e).

Thirdly, A.M. has no private right of action for alleged HIPAA violations and therefore her claim addressed to this court must fail on that ground, *Rigaud v. Garofalo*, 2005 W.L. 1030196 (E.D. Pa. 2005), collecting other cases and noting that an aggrieved party may complain to the Secretary of Health who may investigate any complaints in administrative proceedings. 45 C.F.R. §160.306, §§160.500-160.570.

A.M.'s claim is frivolous. HIPAA was created to provide nationwide protection for medical information by regulating how covered entities might use and disclose the same. Congress also established HIPAA to enable people to switch jobs without losing their health coverage. It was not established to interfere with social services or law enforcement. See, generally, 45 C.F.R. §164.512.

8, 11, 44 — Failure of the court to "confirm service of any motions, petitions and hearings/proceedings on appellant prior to entering rulings/decisions."

A.M. claims she was never served, and thus had no knowledge of the various proceedings, including the initial emergency petition for involuntary intervention filed on or about January 23, 2013. If so, A.M. only has herself to blame. As presented to the court during the emergency hearing on January 24, 2013, through the entire month of December, 2012, the agency was attempting to meet with A.M., or at least establish telephone contact. She would not answer the door nor return voice messages to the investigator. She became wholly uncooperative and indeed appeared to be dodging Mr. Bernard. In attempting to serve the emergency petition on her, the agency fared no better. It appeared that someone was interfering by orchestrating A.M.'s absence from her home. Nevertheless, the agency was able to locate her attorney, William L. McLaughlin, Jr., Esquire, and he did attend the initial hearings before the court in chambers. He was given a copy of the emergency petition. He listened to the oral explanation from Mr. Bernard as to all of the events leading up to the filing of the petition, or at least those which Mr. Bernard was at liberty to discuss. The court did sign an emergency order and scheduled a review hearing for the following day, Friday, January 25, 2013, but that did not take place because of the difficulty in getting notice to A.M. Consequently, the protective services hearing was rescheduled for February 4, 2013, and rescheduled again, but at any rate Mr. McLaughlin was kept apprised. He reported that he himself was having trouble reaching his client, but there was no proceeding in which he did not participate.

A.M.'s personal whereabouts were unknown. It was clear to the court this was an intentional tactic. In mid-February, one of the children, Mark Mazza, contacted

Timothy J. Holman, Esquire, who, curiously, was able to immediately meet A.M. and enter his appearance for her. The court gave A.M. every consideration, including staying its prior orders so that Mr. Holman could have the opportunity to prepare for and articulate all A.M.'s concerns.

16, 22, 28 — The court erred in "allowing" William L. McLaughlin, Jr., Esquire, to represent A.M.

The agency's information was that Mr. McLaughlin represented A.M. He drafted three of the powers of attorney for her which had triggered the investigation. These documents were all approved and signed by her. The agency was able to reach out to Mr. McLaughlin and, as mentioned, he came to all of the initial proceedings on his client's behalf. The court was unaware, as Mr. McLaughlin was unaware, that A.M. did not want his services at the time. But it is simply wrong to assert that Mr. McLaughlin was not A.M.'s attorney. She did not return his calls to let him know of any change in his status. A.M. did not even know Mr. Holman until mid-February. It was the agency's statutory duty to involve the older adult's attorney, and the court certainly had no basis upon which to turn Mr. McLaughlin away.

3, 5, 14, 29, 31, 50, 51 — Failure to conduct a "full and complete" hearing, and variants thereof.

The case was only a few weeks old and the investigation had not gotten very far. A.M. did not want to participate or appear, at least that was the conclusion reached by the court. When in mid-February her new attorney entered his appearance, instead of filing an answer to the emergency petition and allowing the investigation to proceed, A.M. filed her own emergency petition seeking to stay and vacate the earlier orders and challenging the court to schedule a full hearing immediately. The court was unwilling to do

this, and A.M. then filed her appeal with the predictable result that nothing more could occur. The "full hearing" she envisions, and which she interrupted, will certainly take place once her answer is filed, discovery is completed, and the case is ready. The court is also anxious for that to occur; it may well be able to then determine that A.M. is right on one or more of her points.

17, 19 — Admitting documents which constituted hearsay or were not authenticated.

It is well-known that a trial court possesses considerable latitude regarding the admission of evidence. Cases brought under the Older Adult Protective Services Act strike the court as being quite similar to child dependency hearings. In those matters, a child witness' hearsay statements offered by family members or professional investigators may be admitted when the court finds that the time, place and circumstances of such statements possess sufficient indicia of reliability. Such statements, together with corroborative evidence, can satisfy the agency's burden. *L.W.B. v. Sosnowski*, 543 A.2d 1241 (Pa. Cmwlth. 1988). The court was presented with several different powers of attorney signed by A.M., a copy of A.M.'s letter to her family physician, Robert Priem, M.D., revoking all medical authorizations and the agency's letter dated December 20, 2012 advising A.M. that unless she contacted the agency, a petition seeking an involuntary intervention order would be filed. The court was also shown a one-page report signed by Dr. Priem in response to a number of questions that the agency had. The court considered them all to be sufficiently authenticated and reliable under the circumstances. A.M. objects mightily to this and has assigned errors 19, 21, 24 and 48 to the court's conduct. This being an emergency situation, and the court being advised that A.M. was neither keeping her medical appointments nor taking her medicine, the court was very

concerned for her health, well-being and safety. Without proper medical attention, the elderly can go downhill very quickly. In no way did the court abuse its discretion in giving some regard to the documents in question.

19, 21, 24 — That Dr. Priem was unqualified.

These errors also assert that Dr. Priem "lacked qualifications" or that he "knew nothing" about A.M.'s daily activities or home environment, or had no "foundation" to render any opinion. The overriding problem with these "errors" is that A.M.'s assertions are not in the record. A.M. presented not a shred of evidence through the time she took an appeal. Of course, the court understands that she blames the court for that, but the fact remains there is no evidence to support these errors. A.M. will certainly have a later opportunity to develop her claim and to present expert testimony from anyone she chooses as to the condition of her mental and physical health. What was of record is the fact that Dr. Priem is a medical doctor, that he was A.M.'s treating physician, and that he seemed to know something about her. The court inferred that he had seen her more than once and was concerned for her. The court was satisfied that he was qualified, that his impressions were reliable, and ruled accordingly.

10, 39, 45, 46 — Error in appointing Richard Mazza as emergency guardian when Mark Mazza was agent under A.M.'s power of attorney.

In fact, the court did not "name" Richard Mazza as A.M.'s agent, and it did not appoint him in a guardianship role in the first instance. Nor did the court "accept" or "grant" a power of attorney to anyone.

In summary, the court has attempted to address the bulk of the specific errors which are the foundation for its several orders. For this reason, the court sees the

conclusory statements of error, grouped together at A. above, as necessarily being addressed for purposes of Rule 1925(a).

The remaining errors were satisfactorily explained, the court believes, and the court's reasoning set out, in the footnote to its order dated March 19, 2013, another copy of which is attached hereto for ease of reference.

## ORDER

And now, this 19th day of March, 2013, upon consideration of A.M.'s emergency petition to vacate or stay this Honorable Court's emergency order dated January 25, 2013, etc., the parties' briefs and oral argument, it is hereby ordered and decreed, that the said emergency petition of A.M. is denied, and the stay imposed by the court's order of March 1, 2013 in respect to its earlier order dated February 5, 2013 is removed.[1]

---

1. The Chester County Department of Aging Services (hereafter "Department") received a confidential report alleging that A.M. (the "older adult") was the subject of financial mismanagement or abuse. The Department is mandated to implement the provisions of the Older Adults Protective Services Act (hereafter "the Act"), the Act of November 6, 1987, P.L. 381, No. 79 (now 35 P.S. § 10225.101, et seq.). As a consequence of that report, the Department initiated a confidential investigation assigning a responsible staff person, Douglas Bernard, as the investigator.

A.M. is an 88-year old woman who resides alone in her home. She has four adult children, Richard, Mark, Thomas and Lisa. In the last six months, A.M. has executed four powers of attorney.

The first and third named Richard as her agent. The second and fourth named Mark as her agent. The first three powers of attorney were prepared by attorney William McLaughlin, Esquire. The facts and circumstances of the preparation of these documents were very concerning. Additional information was received concerning withdrawals of sizable sums from A.M.'s financial accounts, the presence of a large amount of cash lying around the home, and the belief that her bills were not being paid.

Mr. Bernard was ultimately able to complete a home visit with the older adult, informing her of his role and function under the law, and that it was his duty to complete an investigation. He made several attempts to obtain consents from A.M. A.M. told him that she agreed to make an appointment to *see* her primary care physician, a Dr. Priem, but she

did not follow through with this task. She refused to sign releases of information which would allow the investigator to obtain information from Wells Fargo and Vanguard where her financial accounts were maintained. Additionally, within a day or two A.M. revoked the release she had given with respect to medical information from Dr. Priem.

Subsequent attempts to do home visits by the investigator were unsuccessful, although he saw A.M. inside the home; she refused to answer the door. This caused the Department to send a letter to the older adult again seeking contact and various records, and informing her that otherwise the Department would be obligated to petition the court to get access to those records and to seek an involuntary intervention order.

The investigator, as mandated, continued with his investigation in order to reach a determination of either "substantiation" or "unsubstantiation". He contacted Robert W. Priem, M.D. and learned that A.M. was diagnosed with dementia and hypertension, that she was scheduled for but had not kept a number of medical appointments, had moderately severe memory loss, was confused, and although he had not seen her for five months, he would opine that she was not capable of managing or revoking a power of attorney. Dr. Priem questioned her continued safety at home, and suggested she would do well in an assisted living environment. The investigator also learned from Dr. Priem that A.M. was not taking her dementia medicine.

Mr. Bernard also contacted A.M.'s attorney, William McLaughlin, Esquire seeking information regarding the changes of the power of attorney. Mr. McLaughlin informed him that A.M. refused consent to disclose the requested information. Mr. Bernard made two additional attempts to reach the older adult at her home. They were unsuccessful, whereupon the Department filed an emergency petition for involuntary intervention pursuant to 35 P.S. §10225.307, et seq. of the Older Adults Protective Services Act. The petition related the facts set forth above.

The court scheduled a review hearing on January 24, 2013. The court met in chambers with counsel for the Department, the investigator Mr. Bernard, and William McLaughlin, Esquire. Mr. McLaughlin indicated that he had not received a call back from his client and so could not make any particular representations or commitments. The court reviewed the facts set out in the petition, and concluded they were serious enough to warrant further action. The Department sought, and the court ordered, access to the older adult's person, and to her financial and medical records. In particular, the order required A.M. to attend and participate in a neuropsychiatric evaluation, the purpose of which was to determine her executive functioning. The court signed an emergency order and scheduled a review hearing for the following day, Friday, January 25, 2013. However, because of the difficulty in getting notice to the older adult, the protective services review hearing was extended to February 4, 2013.

The Department applied for and the court signed an emergency order to freeze assets on February 4, 2013 to protect A.M.'s financial accounts from any further diminishment. On the following day, February

5, 2013, the Department applied for a further continuation of the review hearing because a medical evaluation of A.M. had not yet occurred. The Department also requested, and the court ordered, one of A.M.'s sons to provide access to A.M.'s residence with a key that he had. Additionally, police assistance, if needed, was ordered, including breaking into the premises. A.M.'s attorney was apprised of all of these developments.

Following the issuance of that order on February 5, 2013, new counsel, Timothy J. Holman, Esquire, appeared for A.M., and sought an administrative conference with the court and the Department. This was granted. Mr. Holman shared his grave reservations about these proceedings. As set out in the emergency petition he filed to vacate or stay this Honorable Court's emergency orders, A.M. essentially disagreed with the information in possession of the Department, questioned the Department's authority to proceed and demanded a hearing to put the Department "to its proofs." At the end of the conference, the court requested that the parties brief the matter and scheduled oral argument. It signed an order March 1, 2013, temporarily staying its order dated February 5, 2013.

Oral argument occurred March 14, 2013. A.M. argued that there was no evidentiary support for any of the orders entered to date, including a decree that A.M. was "incapacitated", directing her to attend a neuropsychiatric evaluation, authorizing access to two years' worth of her bank statements, receiving her entire medical file, and allowing the police to break and enter her home. No witness had testified, no document had been entered into evidence, and there was no record at all.

A.M. was insistent that a hearing be held to determine whether the Department had been denied access to her or her records. She wanted the Department to name any third person or caretaker who was responsible for blocking access. A.M. argued that she was never adjudicated as an incapacitated person under the guardianship statute at 20 Pa. C.S.A. §5501, et seq. Furthermore, she challenged the Department to show clear and convincing evidence of an imminent risk of death or serious bodily injury before any access was ordered.

In enacting the Older Adults Protective Services Act, the Legislature declared it to be a policy of the Commonwealth that older adults who lack the capacity to protect themselves and are at imminent risk of abuse, neglect, exploitation or abandonment shall have access to and be provided with services necessary to protect their health, safety and welfare. The Act is to be liberally construed to assure availability of protective services to all older adults in need of them. A uniform statewide reporting and investigative system for suspected abuse was created. *See* 35 P.S. §10225.102. Each area agency on aging is required to have a protective services plan, §10225.301(c), and must be able to receive reports of older adults in need of protective services 24 hours a day, 7 days a week. §10225.302(b). It is the responsibility of the agency to provide for an investigation of each report within 72 hours after receipt, and to determine whether the report is substantiated or unsubstantiated; if the latter, then the agency is to provide protective services pursuant to

a service plan. 35 P.S. §10225.303. The Act is so structured that an older adult will ordinarily receive protective services voluntarily. The agency is to have access to all relevant records, and to the person of the older adult. §10225.304.

When an agency is denied access to an older adult reported to be in need of protective services before its investigation is completed, the agency may petition the court for an order requiring appropriate access "...when either of the following conditions apply: (1) the caretaker or third party has interfered with the completion of the investigation or the client assessment and service plan or the delivery of services; (2) the agency can demonstrate that the older adult reported to be in need of protective services is denying access because of coercion, extortion or justifiable fear of future abuse, neglect or exploitation or abandonment." §10225.304(f).

It appeared to the court that, at least at this early stage of the investigation, the case bore classic features of need: the older adult was 88 years of age, carrying a diagnosis of dementia, with confusion. She had, according to her own physician, the cognitive inability to appreciate executing or revoking a power of attorney. There were four children, and the agent of the power of attorney was being changed back and forth between some of them, from which it can be inferred that the older adult was unable to resist being manipulated. Furthermore, she was unable to keep medical appointments, nor remember to take her medicine for her mental condition. She initially gave consent for the release of medical information, and made an appointment to see her physician, but this was abruptly cancelled, and contemporaneously the person of the older adult was nowhere to be found. Despite repeated attempts to contact her both personally and by letter, the situation did not improve, in addition to which was the matter of potential financial exploitation.

The agency is mandated to protect the older adult's right to privacy by keeping all cases confidential as it performs its investigation. All reports and records "shall be maintained under regulations promulgated by the Department to safeguard confidentiality." §10225.306(a).

It was clear enough to the court that someone was interfering with the completion of the investigation. The Department was perhaps unable to determine who it was but, in any event, the Department is not required to name that person or persons. Given that the Act is to be construed liberally in order to effectuate the legislative policy, the requirements of this section referring to access to the person were met in the court's estimation. The same rationale applies to the denial of access to the older adult's records under §10225.304(h), and were likewise met for the same reasons.

At this juncture, it was demonstrated that A.M. also met the definition of an "incapacitated older adult." The regulations promulgated by the Secretary, at 6 Pa. Code § 15.2 define "incapacitated older adult" as an "older adult who, because of one or more functional limitations, needs the assistance of another person to perform or obtain services necessary to maintain physical or mental health. The definition of capacity or

incapacity or competence or incompetence, as defined in 20 Pa. C.S. §§ 5501-5555 (relating to guardianship), does not apply to this definition." This answers several of the objections of A.M.

A.M. also complains that she was not given proper notice of the proceedings and therefore her rights to due process were violated. The regulations further provide that when an agency petitions the court for emergency involuntary intervention the agency "shall make sure the older adult has the opportunity to be represented by counsel at all stages of the proceedings. If the older adult has an attorney known to the agency, the agency shall attempt to notify that attorney before it files a petition for emergency involuntary intervention... Notification to counsel shall include a copy of the petition with the affidavits attached, as well as the time, date and place of presentation of the petition..." 6 Pa. Code § 15.71. The investigator complied with this provision to the letter. Even prior to the presentation of the emergency involuntary intervention petition, Mr. Bernard contacted Mr. McLaughlin and apprised him of the investigation. Mr. McLaughlin attended the proceedings until he was replaced by Mr. Holman. Mr. Holman was contacted by one of A.M.'s children who apparently did not recognize, or was not satisfied with, Mr. McLaughlin's appearance. But nothing occurred *ex parte.*

A.M. insists that she is not incapacitated. She nonetheless refuses to meet with her doctor, release medical information that will bear upon her mental and physical health, and refuses to voluntarily participate in a neuropsychiatric exam. All of this frustrates the purpose of the investigation and essentially halts it in its tracks. The Department cannot determine whether the report it received was substantiated or not, and if substantiated provide protective services. The Department had no alternative other than to file an emergency petition, as it informed A.M. it would, pursuant to §10225.307(a). That section provides that "where there is clear and convincing evidence that if protective services are not provided, the person to be protected is at imminent risk of death or serious physical harm, the agency may petition the court for an emergency order to provide the necessary services." Forcible entry is specifically authorized upon a court order if it should become necessary to get access to the premises. §10225.307(d). Under the facts set out above, the court was satisfied that the older adult was at the point of serious physical harm, given that she was not seeing her doctors, taking her medicines for impaired cognition, and not paying her bills. Taking these together, A.M. no longer had the executive functioning required to provide for even her most basic needs.

Nor was this the first case of its kind the court had ever experienced.

Counsel for A.M. seemed to be particularly appalled by the portion of the court's order allowing forcible entry. The short answer to this is to ask who would not break down someone's door if they suspected an elderly person inside might be in danger by fire or other peril.

As to A.M.'s argument that her constitutional rights were violated, this question was addressed by the Commonwealth Court in *In The*

*Interest of M.B., an Older Adult*, 686 A.2d 877 (Pa. Cmwlth. 1996). The issue there was whether the agency, proceeding under § 7(h)(2) (now 35 P.S. § 10225.304(h)(2)) due to denial of access to records, was first required to go to a hearing and prove the incompetence of the older adult. M.B. contended that the grant of access without notice and a hearing violated her constitutional right to privacy and deprived her of due process of law. Citing *Stenger v. Lehigh Valley Hospital Center*, 530 Pa. 426, 609 A.2d 796 (1992), the Commonwealth Court acknowledged that under the United States and Pennsylvania Constitutions there was a right to privacy, in this case a right to avoid disclosure of personal information. The Commonwealth Court noted that this right is not absolute and can be abridged in order to further a compelling state interest. The Commonwealth Court concluded that the Commonwealth's interest in protecting older adults from abuse, neglect, exploitation, or abandonment was "certainly compelling." Accordingly, it held that when the circumstances outlined in § 10225.304(h)(2) exist, the court may grant an agency access to personal records without offending the Constitutions of the United States or the Commonwealth. *Id.*, 881. Procedurally, the agency is required to file a petition with the court. Nonetheless, the use of the word "demonstrate" in this section indicates that a hearing is not required in all cases. *Id.*

This court believes that the term "demonstrate" falls somewhere between a simple averment on the one hand, and a full evidentiary hearing on the other. This court believes that the Department met its burden to "demonstrate" when it produced its investigator and a quantum of facts, all as related above, before the court and the older adult's attorney in chambers. It is true that no record was made, but in emergent situations, similar to special injunctions, a record may not be made.

Instead of filing an answer to the petition, as the Commonwealth Court envisioned would next occur, here the older adult filed her own emergency motion to vacate, challenging the court to put the Department "to its proofs" now. The court believes that this puts the rabbit in the hat, and is calculated to stymie the Department by demanding proof out of what is still a nascent investigation, and a confidential one to boot. Few investigations will proceed far if interrupted in this fashion.

After the older adult files an answer, the Commonwealth Court envisioned that there would be court-ordered discovery regarding disputed issues of fact, evidentiary hearings and argument by the parties. *Id.* 882. Procedural due process is thus assured.

Accordingly, this court holds that A.M.'s constitutional rights have not been violated, and will re-impose its prior order dated February 5, 2013.