**Paul E. HASSETT,**

**v.**

**Donald DAFOE, M.D., James F. Burke, Jr., M.D., George Francos, M.D., Rakesh Gulati, M.D., Jefferson University Physicians, Jefferson Renal Associates, Thomas Jefferson University Hospital, Wyeth Inc., Wyeth Pharmaceuticals Inc., Schwarz Pharma, Inc., Schwarz Pharma, Inc. d/b/a Schwarz Pharma, USA, Schwarz Pharma, USA, Pliva Inc., Teva Pharmaceuticals Industries, Ltd, Teva Pharmaceuticals Industries, Ltd d/b/a Teva Pharmaceutical USA, Inc., Teva Pharmaceutical USA, Inc.**

**Appeal of Pliva, Inc., and Teva Pharmaceuticals USA, Inc., Appellants.**

Superior Court of Pennsylvania.

Argued Nov. 28, 2012.

Filed July 29, 2013.

Reargument Denied Oct. 2, 2013.

Jay J. Lefkowicz, New York, New York, for Teva, appellant.

Howard J. Bashman, Willow Grove, for Hassett, appellee.

BEFORE: STEVENS, P.J., BOWES, and PLATT,* JJ.

OPINION BY BOWES, J.:

PLIVA, Inc. and Teva Pharmaceutical USA, Inc., ("Generic Defendants") appeal from November 18, 2011 order overruling their preliminary objections in the nature of a demurrer to a master complaint filed by Paul E. Hassett, who was allegedly injured after ingesting metoclopramide.[1] The Generic Defendants assert that all of Mr. Hassett's claims against generic manufacturers of metoclopramide, regardless of the legal theory advanced and without consideration of the state law applicable,

---

* Retired Senior Judge assigned to the Superior Court.

1. Mr. Hassett's claims against generic manufacturers are representative of the claims of more than two thousand other plaintiffs pending in the Court of Common Pleas of Philadelphia County. The preliminary objections were filed to the Third Amended Master Long Form Complaint.

are failure-to-warn claims. They continue that all causes of action are indistinguishable from those held pre-empted by the United States Supreme Court in *PLIVA, Inc. v. Mensing*, — U.S. —, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011), and that the trial court erred in not dismissing them. After careful review, we reverse in part and affirm in part.

Generic Defendants premise jurisdiction to entertain this interlocutory appeal on the collateral order doctrine. We accept jurisdiction on that basis. For the reasons that follow, we reject Generic Defendants' characterization of all claims herein as *Mensing* failure-to-warn claims as well as their and proposed blanket application of impossibility pre-emption without any regard for the applicable state law. Since all of the *Mensing* claims pre-dated the Food and Drug Administration Amendments Act of 2007 (hereinafter the "FDAAA" or the "Act"), 121 Stat. 823, the Court expressed "no view on the impact of" that legislation. *Mensing, supra* at 2574 n. 1. Thus, we decline to find post-Act claims pre-empted unless there is a thoughtful and careful examination of the federal law and state law applicable to ascertain whether state law compels what is impossible under federal law.[2] However, we do find pre-empted under *Mensing* those failure-to-warn claims arising prior to the 2007 Act that are premised solely on the content of generic drug labels that conform to the brand-name label.

The within appeal is one of four related appeals arising from mass tort litigation in Philadelphia County involving the name-brand drug Reglan and its generic bioequivalent, metoclopramide. The Food and Drug Administration ("FDA") approved metoclopramide under the brand name Reglan in 1980, and five years later, generic manufacturers started producing the drug. The drug stimulates digestive function by speeding up the movement of food through the system, and it is prescribed to treat chronic digestive problems such as diabetic gastroparesis and gastroesophageal reflux. In the years following FDA approval, long-term use of metoclopramide was linked to tardive dyskinesia, a severe and usually permanent neurological disorder characterized by involuntary and uncontrollable movements of the head, neck, face, arms, and trunk including facial grimacing and tongue thrusting. Third Amended Master Long Form Complaint at ¶ 82. Studies showed that as many as twenty-nine percent of the people who took the drug for several years developed tardive dyskinesia. Changes to the label were made in 1985, 2004, and 2009, to strengthen warnings of the dangers associated with use of the drug for more than twelve weeks.

Mr. Hassett and the other plaintiffs in this mass tort litigation commenced civil actions against both the name-brand manufacturers and generic manufacturers, seeking damages for personal injuries and deaths due to their ingestion of either the name brand metoclopramide, Reglan, or its generic bioequivalent.[3] While such claims were pending, the United States Supreme Court granted *certiorari* in two cases: *Mensing v. Wyeth, Inc.*, 588 F.3d 603 (8th Cir.2009) (under Minnesota law) and *Demahy v. Actavis, Inc.*, 593 F.3d 428

---

**2.** Generic Defendants do not address the impact of the 2007 Act on the pre-emption of state law failure-to-warn claims arising after the Act.

**3.** A.H. Robins Company, Inc. received FDA approval for injectable Reglan in 1979, and in tablet form in 1980. It subsequently merged with Wyeth, which was then acquired by Pfizer, Inc. Schwarz Pharma purchased the formula for Reglan from Wyeth and Alaven Pharmaceuticals subsequently purchased the formula from Schwarz. Third Amended Master Long Form Complaint, ¶¶ 90–95.

(5th Cir.2010) (under Louisiana law), to determine whether state failure to warn claims based upon inadequate drug labeling could be maintained against generic drug manufacturers. The precise question was "whether federal drug regulations applicable to generic drug manufacturers directly conflict with, and thus pre-empt, these state-law claims." *Mensing*, 131 S.Ct. at 2572.

The *Mensing* Court thoroughly discussed the differences in the federal regulations governing name-brand drug manufacturers, *i.e.*, the Reference Listed Drug ("RLD") holders, and those pertaining to generic drug manufacturers, many of which originated with the passage of the 1984 Hatch–Waxman Amendments. That legislation streamlined the process whereby generic drug manufacturers could receive FDA approval to market their drugs. Rather than requiring generic manufacturers to file a New Drug Application ("NDA") with the FDA, and to conduct extensive clinical trials to prove that their drugs were safe and effective, the Amendments permitted generic manufacturers to submit Abbreviated New Drug Applications ("ANDA") demonstrating that the generic drug contained the same active ingredient, in the same dosage, with the same therapeutic effect as the already approved RLD. In addition, the legislation also mandated that the generic drug's labeling be identical to the RLD's labeling. 21 U.S.C. § 355(j)(2)(A)(v). While an RLD could change the warning on its label by utilizing a process known as "Changes Being Effected" ("CBE"), 21 C.F.R. § 314.70(c)(6)(iii)(C), that procedure was not available to generic manufacturers. Rather, a generic manufacturer could only change its label to conform to an updated RLD label or in response to an FDA directive.

The FDAAA, 121 Stat. 823, was enacted on September 27, 2007. The *Mensing* Court noted that its holding "express[ed] no view on the impact of the 2007 Act." *Mensing* at 2574 n. 1. The Court concluded that federal law applicable at the time the relevant events occurred in *Mensing* and *Demahy* precluded generic drug manufacturers from unilaterally changing their labels to strengthen a warning, which was the duty imposed in state failure-to-warn cases. It rejected the plaintiffs' assertions that generic manufacturers could use the CBE procedure to change their labels or issue warnings to doctors via Dear Doctor letters. The fact that generic manufacturers could take steps to urge the FDA to change the warnings on the drug's label did not mandate a different result. The *Mensing* Court reasoned that "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Mensing*, at 2581–82. State law yielded to federal law. Thus, Minnesota and Louisiana tort-law claims based on generic drug manufacturers' failure to provide adequate warning labels for generic metoclopramide were pre-empted by federal law.

In reliance upon *Mensing*, Generic Defendants filed preliminary objections to Mr. Hassett's third amended long form master complaint seeking dismissal of all claims against generic manufacturers of metoclopramide on pre-emption grounds. The trial court overruled the preliminary objections and held that Generic Defendants failed to sustain their heavy burden of proving with certainty that no legal recovery was possible. The court recognized the rebuttable presumption that under Pennsylvania's choice of law rules, the law of the domiciles of the various plain-

tiffs would apply, and that blanket pre-emption was premature absent a state-by-state analysis.

The court denied Generic Defendants' motion for reconsideration, but granted their motions to certify the order as one involving "a controlling question of law as to which there is a substantial ground for difference of opinion" and for which "an immediate appeal ... may materially advance the ultimate determination of the matter." Order, 12/16/11, at 1 (quoting 42 Pa.C.S.A. § 702(b)). Generic Defendants then filed both a timely petition for permission to appeal, which this Court denied by order of March 12, 2012, and an appeal as of right. Mr. Hassett moved to quash the appeal. By order of April 11, 2012, this Court denied the motion without prejudice to reassert the issue before this panel, which Mr. Hassett has done.

Generic Defendants raise one issue for our review:

> Did the trial court err in refusing to dismiss Plaintiffs' claims against the Generic Defendants as preempted by federal law in light of the United States Supreme Court's holding in *PLIVA, Inc. v. Mensing* [—— U.S. ——], 131 S.Ct. 2567 [180 L.Ed.2d 580] (2011)?

Appellants' brief at 2.

Prior to reaching the pre-emption issue, we must first address Mr. Hassett's contention that this Court lacks jurisdiction to entertain this interlocutory appeal. He maintains that the collateral order doctrine supplies the only possible basis for jurisdiction, but that the order appealed from does not meet the three-pronged test for its application.

■ A collateral order is defined as "an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if

review is postponed until final judgment in the case, the claim will be irreparably lost." Pa.R.A.P. 313(b). Our High Court has delineated three requirements that must be satisfied in order for the doctrine to apply. The order must be "separable from and collateral to the main cause of action;" it must involve a right that "is too important to be denied review;" and, "if review is postponed until final judgment, the claim will be irreparably lost." *Vaccone v. Syken*, 587 Pa. 380, 899 A.2d 1103, 1106 (2006). The doctrine is to be narrowly interpreted as it is an exception to the rule of finality. *Id.; see also Rae v. Pennsylvania Funeral Directors Association*, 602 Pa. 65, 977 A.2d 1121, 1126 (2009).

Mr. Hassett argues that Generic Defendants cannot satisfy any of the three prongs. He contends that pre-emption requires an examination of underlying state-law duties, and a determination as to whether those duties conflict with federal law. Such analysis, according to Mr. Hassett, necessarily involves the merits of the underlying claims. Further, Mr. Hassett maintains that it does not involve a right "too important to be denied review." *Gunn v. Automobile Ins. Co.*, 971 A.2d 505 (Pa.Super.2009). He urges us to follow federal precedent to the effect that an order that a state claim is not pre-empted is not the equivalent of an immunity from suit and hence, not immediately appealable as a collateral order. *See Martin v. Halliburton*, 618 F.3d 476 (5th Cir.2010), and cases cited therein. Finally, Mr. Hassett attempts to distinguish pre-emption from immunity from suit and asserts that the right is not irreparably lost if appellate review is postponed.

Generic Defendants rely upon our Supreme Court's decision in *Pridgen v. Parker Hannifin Corp.*, 588 Pa. 405, 905 A.2d 422 (2006), as the basis for collateral order jurisdiction. In resolving the issue of

whether an order denying summary judgment premised on the General Aviation Revitalization Act's eighteen year statute of repose was appealable as a collateral order, the Court adopted and applied the United States Supreme Court's legal/factual approach to collateral orders espoused in *Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). In that case, the district court denied the police officers' motion for summary judgment premised on qualified immunity, finding sufficient evidence in the record that the officers watched and allowed others to beat the plaintiff to support liability. The officers appealed the order denying summary judgment as a collateral order. The *Johnson* Court concluded that the order was not appealable as the legal issue, qualified immunity, was not separate from the fact-related legal issues underlying the merits of the plaintiff's claims.

In *Pridgen,* plaintiffs maintained that the airplane crash was caused by a failure of engine and fuel system components that were replaced and overhauled within eighteen years of the date of the accident. Defendants countered that they did not manufacture or supply any of the allegedly defective replacement parts within eighteen years of the accident, an assertion that plaintiffs did not dispute. The rolling provision of the statute of repose provided that the eighteen-year period commenced to run when component parts were installed. Defendants framed the issue on appeal as a legal one: whether an original manufacturer was liable under GARA's rolling provision for the alleged failure of airplane replacement parts that it did not physically manufacture. Thus, the focus was on the terms of the statute, not on determinations of fact or the scope of liability. Our High Court, acknowledging that it "has adopted a practical analysis recognizing that some potential interrelationship between merits issues and the

question sought to be raised in the interlocutory appeal is tolerable[,]" concluded that this legal issue was separable from the merits of the underlying case. *Pridgen,* at 433 (citations omitted). Additionally, in furtherance of the policy of cost control, the Court found the federal interest underpinning GARA to be sufficiently important to allow appellate courts to weigh in on the issue. Finally, the Court viewed the substantial cost that manufacturers would incur in defending complex litigation at trial "a sufficient loss" to support the third element of the collateral order test.

█ The issue before us is whether all claims asserted by Mr. Hassett and the other plaintiffs against generic drug manufacturers are failure to warn claims preempted by *Mensing.* Thus, our analysis focuses largely on the scope of *Mensing* and the nature of the allegations contained in the Third Amended Long Form Master Complaint. We need not examine the merits of the underlying claims or resolve factual disputes. Hence, we find the preemption issue as phrased sufficiently separable from the merits of the underlying claims to satisfy the first prong of the collateral order doctrine.

█ With regard to the second prong, implicated herein is the role of state tort law in the federally regulated realm of generic drugs. The public policies surrounding comity and the Hatch–Waxman Amendments, designed to promote access to low-cost alternatives to name-brand drugs, are characteristic of rights "too important to be denied review." Finally, cognizant of the substantial cost that Generic Defendants would incur in defending more than two thousand lawsuits, we find sufficient loss to satisfy the third prong of the test.

Having concluded that we have jurisdiction to entertain the within appeal pursuant to the collateral order doctrine, we turn to the pre-emption issue. In reviewing the overruling of preliminary objections in the nature of a demurrer, we apply the same standard as the trial court. *See De Lage Landen Services, Inc. v. Urban Partnership, LLC*, 903 A.2d 586, 589 (Pa.Super.2006). "All material facts set forth in the complaint as well as all inferences reasonably deducible therefrom are admitted as true for the purpose of this review. The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible." *Soto v. Nabisco, Inc.*, 32 A.3d 787, 790 (Pa.Super.2011). Any doubt is resolved by refusing to sustain the demurrer. *Insurance Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 588 Pa. 470, 905 A.2d 462, 468 (2006); *Butler v. Charles Powers Estate*, 29 A.3d 35 (Pa.Super.2011) (reversed on other grounds by *Butler v. Charles Powers Estate ex rel. Warren*, 65 A.3d 885 (Pa. 2013)). The trial court applied the proper legal standard and concluded that it was not certain that recovery was impossible. Our review is plenary, and we reverse only if the trial court has committed an error of law or an abuse of discretion. *Id.*

We recognize a presumption against federal pre-emption of state law. *Dooner v. DiDonato*, 601 Pa. 209, 971 A.2d 1187 (2009) (citing *Altria Group, Inc. v. Good*, 555 U.S. 70, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008)). In *Kiak v. Crown Equipment Corp.*, 989 A.2d 385, 390 (Pa.Super.2010), this Court attributed that presumption to the "dual jurisdiction" which "results from reasons of comity and mutual respect between the two judicial systems that form the framework of our democracy." *Fetterman v. Green*, 455

Pa.Super. 639, 689 A.2d 289, 292 (1997); *see also Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). As the United States Supreme Court noted in *Altria Group, Inc., supra:*

> When addressing questions of express or implied preemption, we begin our analysis "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States. *[Medtronic Inc. v.] Lohr*, 518 U.S. at 485, 116 S.Ct. 2240, 135 L.Ed.2d 700; *see also [Lorillard Tobacco Co. v.] Reilly*, 533 U.S. at 541–542, 121 S.Ct. 2404, 150 L.Ed.2d 532 [ (2001) ] ("Because 'federal law is said to bar state action in a field of traditional state regulation,' namely, advertising, we 'work on the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that is the clear and manifest purpose of Congress' " (citation omitted)). Thus, when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005).

*Altria Group, Inc.*, 555 U.S. at 77, 129 S.Ct. 538.

At issue herein is impossibility pre-emption, the type of implied conflict pre-emption that arises when it is impossible to comply with both federal and state

law.[4] *Kiak, supra.* As the Supreme Court recognized in *Wyeth v. Levine,* 555 U.S. 555, 573, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009), "[i]mpossibility pre-emption is a demanding defense." Therein, the Supreme Court held that state claims based upon the failure to warn of the risk of gangrene from delivery of Phenergan via IV-push method were not pre-empted on such a theory because the name-brand manufacturer of the drug could have complied with both federal and state law by unilaterally strengthening the drug's warning in order to comply with the latter.

In *Mensing,* the Court reasoned that since a generic manufacturer is responsible under federal law for ensuring that its warning label is the same as the brand name's label, and it cannot unilaterally change its label to attach a stronger label as required by state law, it was impossible for generic drug manufacturers to comply with both federal and state law. State law must yield where state and federal law directly conflict. *Mensing, supra.* Thus, the claims were held to be pre-empted.

In its recent decision in *Mutual Pharmaceutical Co. v. Bartlett,* — U.S. —, 133 S.Ct. 2466, 186 L.Ed.2d 607 (2013), the United States Supreme Court revisited *Mensing* impossibility pre-emption in reviewing a $21 million judgment against the manufacturer of a generic form of sulindac based on a design defect theory. The *Bartlett* Court concluded that New Hampshire's version of § 402A liability did not impose absolute liability on manufacturers, but instead, a "duty to design [their products] reasonably safely for the uses which [they] can foresee." *Id.* at 2473. Under that state's risk-utility approach, increasing the usefulness of the drug or reducing

its risks could only be accomplished by either redesigning the drug, an option foreclosed by the FDCA and by the fact that the drug was composed of only one molecule, or strengthening the warning on its label. The Court concluded that New Hampshire's law ultimately required the generic manufacturer to change sulindac's labeling, an action prohibited under federal law. By imposing a duty that mandated non-compliance with federal law, state law violated the Supremacy Clause, and hence, was pre-empted. However, the Court expressly reserved "for another day the question whether a true absolute-liability state-law system could give rise to absolute-liability pre-emption." *Id.* at 2474 n. 1.

Against this backdrop, Generic Defendants contend that all of Mr. Hassett's claims are essentially failure to warn claims requiring them to change the label, and that the pre-emption issue herein is indistinguishable from that in *Mensing.* They compare portions of the master complaint herein with the *Mensing* complaint and argue that they present similar claims. They rely upon the persuasive impact of the "tsunami of cases" applying *Mensing* to pre-empt virtually all state tort claims against generic manufacturers. Appellants' brief at 17 quoting *Bowman v. Wyeth, LLC,* 2012 WL 684116, at *7 (D.Minn.2012).

Notably, with the exception of the United States Supreme Court, we are not bound by those federal court decisions. *NASDAQ OMX PHLX, Inc. v. PennMont Secs.,* 52 A.3d 296, 303 (Pa.Super.2012). Nor do we find the sheer weight of these authorities persuasive.[5] Absent from the

4. The FDAAA was signed into law on September 27, 2007. Notably, Congress did not include an express preemption provision.

5. Appellants direct our attention to numerous cases decided after *Mensing,* in which dismissal was predicated upon that decision. However, Appellants fail to distinguish be-

vast majority of these cases is the identification of state law duties associated with various causes of action and a cogent analysis of how they conflict with federal law, which is the hallmark of an impossibility pre-emption determination. Furthermore, as the *Bartlett* Court's analysis of New Hampshire law illustrates, pre-emption issues are state-law specific, a nuance not appreciated by Generic Defendants.[6] Additionally, Generic Defendants gloss over critical distinctions between strict liability and negligence for defective products, breach of warranty, misrepresentation and fraud theories of liability, without examining the state-law duty allegedly violated. Finally, in urging us to give a sweeping effect to *Mensing,* Generic Defendants fail to compare the pleadings herein with the arguments actually advanced in the Supreme Court in *Mensing,* all of which implicated the adequacy of the warning on the product label.

 Mr. Hassett contends that the complaint herein does not frame every issue in terms of a failure to strengthen the label. In counts I, II, and III, asserting strict liability and negligence for defective design, liability is premised upon Generic Defendants' sale and marketing of a drug they knew was unreasonably dangerous or defective. Third Amended Long Form Master Complaint ¶¶ 132, 133. The product was alleged to be unreasonably dangerous when it left the manufacturer's hands, and was expected to and did reach the consumer without substantial change. *Id.* at ¶¶ 145–147. Mr. Hassett, as well as the roughly 2000 other plaintiffs in this mass tort litigation, pled that the drug has never been shown "to be either efficacious or safe when used for long-term treatment."

*Id.* at ¶ 88. Moreover, Mr. Hassett pled that the generic manufacturers continued to market their dangerous drugs despite the fact that there were safer and less expensive alternatives available. *Id.* at ¶ 159.

These allegations suggest that the drug, even when used as recommended and with appropriate warnings, was defective and unreasonably dangerous. Such averments do not necessarily implicate labeling, but assert absolute liability based on the sale of a defective or unreasonably dangerous product. The ability or duty to redesign a product is not an element of this cause of action. *See* Restatement (Second) of Torts § 402A cmt. f (1965) ("The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, ..."). Thus, according to Mr. Hassett, Generic Defendants can comply with federal law, which does not permit them to unilaterally alter a drug's design, and state law, which extends liability to a manufacturer of a defectively designed drug without regard to whether it may redesign its drug.

We observe that the *Wyeth* Court found no impossibility pre-emption on a similar rationale. The Court found no demonstration therein that it was impossible to comply with both federal and state requirements where "the CBE regulation permitted Wyeth to unilaterally strengthen its warning, and the mere fact that the FDA approved Phenergan's label [did] not establish that it would have prohibited such a change." *Wyeth, supra* at 573, 129 S.Ct. 1187. There was no impossibility

---

tween those involving pre-*Mensing* complaints and complaints like the master complaint herein that were amended in light of *Mensing.*

6. In this mass tort litigation involving more than two thousand plaintiffs, many different states' laws are potentially implicated.

conflict because state law did not require what federal law forbade. *See Wyeth v. Levine, supra.*

The *Bartlett* Court expressly left open the issue of whether § 402A strict products liability design defect claims would be pre-empted. It did not address, or reject, the argument Mr. Hassett asserts herein: that under § 402A strict products liability, it is unnecessary for a plaintiff to demonstrate that a defendant should or could have altered the design or the warnings.[7] The *Bartlett* Court concluded that under New Hampshire's law, § 402A imposed a duty upon a product manufacturer to "design his product reasonably safely for the uses which he can foresee." *Mutual Pharmaceutical Co. v. Bartlett, supra* at 2474. That duty was satisfied either by changing the design or the labeling. Since Mutual, a generic manufacturer of sulindac, had no ability to change the design, the Court concluded that it was required to change the labeling to avoid liability under state law, an impossibility after *Mensing.* Thus, Mr. Hassett's argument that *Mensing* does not pre-empt strict liability design defect claims under those states' laws which subject distributors and retailers of defective products to strict liability even though they have no control over the design of the product appears to have some vitality after *Mensing* and *Bartlett.*[8]

In support of his contention that strict liability, negligence, and breach of warranty claims are not necessarily failure to warn claims, Mr. Hassett directs our attention to three United States Supreme Court cases concluding just that in the context of federal labeling statutes. In *Cipollone v. Liggett Group,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), a plurality of the Supreme Court distinguished failure to warn claims from claims alleging negligence in the manner in which defendants' cigarettes were tested, sold, and advertised. Only the former were pre-empted by the 1969 amendments to the (cigarette) Labeling Act of 1965. *Id.* at 525, 112 S.Ct. 2608.

More recently, in *Bates v. Dow Agrosciences, LLC,* 544 U.S. 431, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005), the Supreme Court addressed whether state strict liability design defect and warranty claims were preempted by the Federal Insecticide, Fungicide, and Rodenticide Act's ("FIFRA") labeling and packaging requirements. Texas farmers asserted claims in strict liability, negligence, breach of warranty, fraud, and violations of the Texas Deceptive Trade Practices–Consumer Protection Act for damages to their peanut crops caused by application of Dow's pesticide, "Strongarm." The farmers claimed that Dow knew or should have known that Strongarm stunted the growth of peanuts growing in soils with pH levels of 7.0 or greater, but the company's agents and the

---

**7.** It is undisputed that FDA approval of a name-brand drug and/or its label does not preclude a state law tort claim against that manufacturer based on defective design. *See Wyeth v. Levine,* 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009).

**8.** Mr. Hassett's argument that Generic Defendants can comply with state law simply by not selling their defective drugs, a decision that they can make independently of the FDA, and one that does not run afoul of federal law, was largely rejected in *Bartlett.* The Supreme

Court found that argument "incompatible with our pre-emption jurisprudence." *Bartlett, supra* at 2477 ("leaving aside the rare case in which state or federal law actually requires a product to be pulled from the market—our pre-emption cases presume that a manufacturer's ability to stop selling does not turn impossibility into possibility. *See, e.g., Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)").

product label recommended its use in all areas where peanuts were grown. Dow maintained that the farmers' state-law claims were pre-empted by FIFRA's labeling requirements.

The district court granted summary judgment in favor of Dow, finding all claims but one to be expressly pre-empted by 7 U.S.C. § 136v(b), which provided that "Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." 7 U.S.C.S. § 136v(b). The court of appeals affirmed, holding that § 136v(b) pre-empted any state-law claim in which a judgment against Dow would induce it to alter its product label. The strict liability, negligent testing and manufacturing claims were viewed by that court as disguised failure to warn claims, and all were found preempted. The Supreme Court granted certiorari to resolve a conflict among the circuits on the pre-emption issue.

The *Bates* Court carefully traced the history of the statute, noting that FIFRA was a comprehensive statute conferring upon the EPA the authority to regulate the use, sale and labeling of pesticides. However, in order to be pre-empted, the Supreme Court concluded that the state law requirement had to be one for labeling or packaging and it had to be different from or in addition to those required under the federal statute. If the state requirement was consistent or equivalent to the FIFRA requirement, it was not pre-empted. The Court rejected the Fifth Circuit Court of Appeals' supposition that claims based on defective design or manufacture, breach of warranty, or negligent testing

implicated labeling or packaging, and found that none of the common law rules upon which these claims were based required that manufacturers label or package their products in any particular way. The Court held that "Rules that require manufacturers to design reasonably safe products, to use due care in conducting appropriate testing of their products, to market products free of manufacturing defects, and to honor their express warranties or other contractual commitments plainly do not qualify as requirements for 'labeling or packaging'." 544 U.S. at 444, 125 S.Ct. 1788.[9] We note that the *Bartlett* Court expressly affirmed the *Bates* holding in the prescription drug arena.

Finally, in *Altria Group, Inc., supra,* the Supreme Court rejected the argument that fraud and unfair trade practice claims under Maine's law were pre-empted by the Labeling Act, finding that such claims were predicated on the duty not to deceive, not a failure to warn.

These decisions support Mr. Hassett's position in several respects. First, they clarify that federal labeling regulations pre-empt state law labeling and packaging requirements only to the extent that they are different from or in addition to those mandated by the federal statute. Second, they highlight that a proper pre-emption analysis is dependent upon a comparison of the federal statute or regulation and the particular state law applicable. *See Foster v. Love,* 522 U.S. 67, 71, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997) (holding preemption must turn on whether state law conflicts with the text of the relevant federal statute or regulation). Third, and most impor-

---

**9.** The Court remanded issues of fraud and negligent failure to warn, which it found to be premised on labeling requirements, to determine if under Texas law, they were in addition to or different from FIFRA's labeling requirements, citing *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 495, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (holding nothing in the medical device statute "denied Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements.")

tantly, they illustrate that while federal labeling statutes may pre-empt state failure to warn claims, they do not pre-empt claims based upon the marketing of defective products, a lack of due care in testing, or a product's failure to conform to express and implied warranties, all of which are alleged herein.

◼ In Count VII, breach of express and implied warranties, Mr. Hassett seeks to impose liability against Generic Defendants for failing to deliver products that conformed to the properties described in the label and promotional materials. Third Amended Master Long Form Complaint, ¶¶ 193–196. Such a claim is not premised on the inadequacy of the label but rather on the product's failure to live up to or conform to its label and advertising. The only warranties identified in *Mensing* were those contained in labeling, *i.e.,* package inserts shipped with the drug from the factory. The claims asserted herein implicate warranties arising from advertising and promotional materials that arguably do not fall within the definition of labeling under the Act. *See* 21 USCS § 321(m) (defining the term labeling as "all labels and other written, printed, or graphic matters (1) upon any article or any of its containers or wrappers, or (2) accompanying such article"). A label is "a display of written, printed, or graphic matter upon the immediate container of any article." 21 USCS § 321(k).

◼ Similarly, Counts V, VI, and VIII of the Complaint contain allegations of fraud and misrepresentation in the advertising and promotion of both name brand and generic drugs. Third Amended Long Form Master Complaint, ¶¶ 171, 174, 182, 189–190, 199–201. Mr. Hassett pled that both name-brand manufacturers and Generic Defendants intentionally, knowingly, and fraudulently misrepresented material facts regarding the safety of the drugs in their advertising and promotional materials, not just their labels, and that physicians and the public relied upon those misrepresentations. *Id.* at ¶ 171. Additionally, Generic Defendants participated and passively cooperated in the dissemination of these misrepresentations in order to induce physicians to prescribe their generic drugs. *Id.* at ¶ 182.

We agree with Mr. Hassett that such allegations of false advertising and promotion are not failure to warn claims based on the label pre-empted by *Mensing.* *See Cipollone, supra* (claims of fraudulent misrepresentation and/or concealment based on state law duties to disclose by other means, as well as breach of warranty claims, were not preempted under the Labeling Act); *Altria Group, Inc., supra.* (rejecting the argument that fraud and unfair trade practice claims under Maine's law were preempted by the Labeling Act, finding that they were not failure-to-warn claims but rather, claims predicated on the duty not to deceive).

◼ Count IX seeks the disgorgement of profits stemming from deceptive practices, such as concealing the risks associated with the drug and misrepresenting its safety. Count XI asserts claims of civil conspiracy based upon the concealment and withholding of information. Such claims are not *Mensing* failure-to-warn claims but state remedies for tortious business practices.[10]

Generic Defendants contend that the so-called *Mensing* carve-outs offer no basis for relief from pre-emption. They allege

---

10. Count XII is a derivative claim for loss of consortium. Counts XIII and XIV are wrongful death and survival actions seeking damages on behalf of the decedent's survivors and estate, respectively.

1)that the failure-to-communicate theory is not viable; 2) that pre-emption cannot be circumvented by claiming that the generic manufacturers should have simply stopped selling their defective products; and 3) that failure to conform a generic label to the label of the RLD is not a viable cause of action.

Mr. Hassett counters that claims that Generic Defendants were negligent because they did not communicate the already strengthened warnings of the RLD are not pre-empted, a claim that at least one court determined survives *Mensing. See Lyman v. Pfizer, Inc.*, 2012 WL 2970627 (D.Vt.2012). Furthermore, he maintains that negligence and negligence *per se* claims premised upon Generic Defendants' failure to update their warning labels to comply with those of the RLD are not pre-empted by *Mensing*.[11] He contends that failure to comply with the FDCA standards renders the drug misbranded *per se*. 21 U.S.C. § 331(a). He and similarly situated plaintiffs pled that they are within the class of persons these regulations are designed to protect, and his injuries are the type of harm the statutes are intended to prevent. Third Amended Long Form Master Complaint ¶ 166. Thus, according to Mr. Hassett, Generic Defendants' non-compliance with federal law serves as evidence of negligence, requiring only proof of causation and damages in order to prevail under many states' laws.[12] Given this viable method of compliance with a state law duty that does not conflict with federal law, Mr. Hassett maintains that impossibility pre-emption is defeated as to these claims. Appellee's brief at 41.

We find merit in Mr. Hassett's position. A federal regulation may establish the standard of care appropriate to the underlying tort of negligence *per se* under state tort law. The Supreme Court held in *Merrell Dow Pharmaceuticals, Inc. v. Thompson, et al.*, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986), that pre-emption was no impediment to the pursuit in an Ohio state court of presumptive negligence claims based on misbranding of a drug in violation of the FDCA where there was no private federal cause of action for the violation. *See* 28 U.S.C. § 1331. Hence, we agree that state negligence claims based upon the misbranding of drugs under the federal statute or failure to conform the generic label to the updated RLD label, a form of misbranding, are not foreclosed by Mensing. *See also Bartlett, supra* at 2477 n. 4 (declining to address state design-defect claims that parallel the federal misbranding statute).

---

11. Failure to timely update generic labeling to incorporate certain FDA-approved warnings added to the labeling for Reglan in 2003 and July 2004 was held to affect the *Mensing* preemption analysis in *Fisher v. Pelstring*, 817 F.Supp.2d 791 (D.S.C.2011), as no federal law prevented the generic manufacturer from adding the warnings.

12. Pennsylvania recognizes that the standard of care may be prescribed by legislative enactment so that "a **violation** of the statute or ordinance may serve as the basis for negligence *per se." Wagner v. Anzon, Inc.*, 453 Pa.Super. 619, 684 A.2d 570, 574 (1996). The plaintiff must show: (1) that the purpose of the statute is "at least in part, to protect the interest of a group of individuals, as opposed to the public generally;" (2) that the statute clearly applies to the conduct of the defendant; (3) that the defendant violated the statute; and (4) that the violation was the proximate cause of the plaintiff's injuries. 684 A.2d at 574. *See* RESTATEMENT (SECOND) OF TORTS § 286 (1965); *see also Phelps v. Wyeth, Inc.*, —— F.Supp.2d ——, 2013 WL 1403060 (D.Or.2013) (holding that plaintiffs' use of the FDCA to inform the standard of care owed under Oregon law was not "enforcing" the FDCA).

■ Finally, Mr. Hassett contends that the *Mensing* Court specifically limited its pre-emption holding to negligent failure to warn claims prior to the promulgation of the FDAAA. We agree with Mr. Hassett that until post-Act claims are subjected to a thorough pre-emption analysis, dismissal of those failure to warn claims is premature.[13]

In conclusion, we find that the master complaint contains some pre–2007 negligent failure-to-warn claims that pre-date the FDAAA of 2007 and that are premised upon the generic manufacturers' failure to strengthen the warnings on their labels. Where those pre–2007 generic labels conformed to the RLD labels, those claims are pre-empted by *Mensing*. The design defect claims may be of the type held to be pre-empted in *Bartlett*. However, without a careful analysis of the applicable state law, pre-emption of all design defect claims is premature. The remaining claims either do not sound in failure to warn, arose after the passage of the 2007 Act, or involve a generic manufacturer's failure to conform its label to that of the name brand, none of which is pre-empted under our reading of *Mensing*. Thus, we agree with the trial court that blanket dismissal of all claims on pre-emption grounds, which was the remedy sought by Generic Defendants herein, is unwarranted.

We hold that only pre-Act failure-to-warn claims based solely on a label that was in conformity with the RLD label are pre-empted under *Mensing*. As to all remaining claims, we affirm the trial court's overruling of preliminary objections in the nature of a demurrer and remand for further proceedings.

Order affirmed in part, reversed in part. Application to quash appeal is denied. Jurisdiction relinquished.

Judge PLATT files a Concurring and Dissenting Opinion.

CONCURRING AND DISSENTING OPINION BY PLATT, J.

I respectfully concur in part and dissent in part.

I concur with the learned Majority's conclusion that we have jurisdiction to review the trial court's order, which is appealable as a collateral order. However, in my opinion, this case and all of the similarly situated companion cases are preempted under the Supremacy Clause of the United States Constitution, following the principles set forth by the United States Supreme Court in *PLIVA, Inc. v. Mensing*, —— U.S. ——, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011) and *Mutual Pharmaceutical Co., Inc. v. Bartlett*, —— U.S.

---

**13.** Mr. Hassett suggests that the *Mensing* rationale will not apply to such claims, pointing to the deference afforded the FDA's acknowledgment in *Mensing* that post-amendment, generic manufacturers are required to propose stronger labeling if it is warranted, and the FDA can unilaterally order it pursuant to 21 U.S.C. § 355(*o*)(4). Thus, he argues, Congress removed at least one of the impediments relied upon in support of impossibility preemption: the requirement that the FDA negotiate with the RLD in order to strengthen the warning label. Furthermore, he contends that the amendments mandate that the FDA withdraw approval of a drug found to be unsafe or ineffective, such as where the "po-

tential for inflicting death or physical injury is not offset by the possibility of therapeutic benefit." Appellee's brief at 58 (quoting 21 U.S.C. §§ 355(e)(1)-(3)). Mr. Hassett concludes that the amendments remove much of the discretion afforded RLDs that made it impossible for generic manufacturers to comply with both state and federal law. Thus, he contends that the landscape for generic manufacturers will more closely resemble that of name-brand manufacturers, and that the *Wyeth* standard will likely govern: claims will be pre-empted only if generic manufacturers demonstrate that the FDA would not have approved the labeling change at the time.

——, 133 S.Ct. 2466, 186 L.Ed.2d 607 (2013). I would vacate the decision of the trial court and remand with instructions to sustain Appellants' preliminary objections.

As the *Mensing* Court noted:

> The Supremacy Clause establishes that federal law "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. Where state and federal law "directly conflict," state law must give way. State law is naturally preempted to the extent of **any** conflict with a federal statute. We have held that state and federal law conflict where it is "impossible for a private party to comply with both state and federal requirements."

*Mensing, supra* at 2577 (case citations, some internal quotation marks and other punctuation omitted) (emphasis added).[1]

It is fundamental that by virtue of the Supremacy Clause, the State courts are bound by the decisions of the Supreme Court with respect to the federal Constitution and federal law, and must adhere to extant Supreme Court jurisprudence. U.S. CONST. art. VI, cl. 2; *Chesapeake & O. Ry. Co. v. Martin,* 283 U.S. 209, 221, 51 S.Ct. 453, 75 L.Ed. 983 (1931). ("The determination by this [C]ourt of [a federal] question is binding upon the state courts, and must be followed, any state law, decision, or rule to the contrary notwithstanding."); *Common-*

*wealth v. Ware,* 446 Pa. 52, 284 A.2d 700, 702 (1971) ("[A] state court is not free to ignore the dictates of the United States Supreme Court on federal constitutional matters because of its own conclusion that those dictates are 'ill-considered.' "). *Council 13, American Federation of State, County and Mun. Employees, AFL–CIO ex rel. Fillman v. Rendell,* 604 Pa. 352, 986 A.2d 63, 77–78 (2009) (footnote omitted).

Here, the chief allegation of the original suits in the class action under the Philadelphia mass tort program was that manufacturers of the brand name drug Reglan and the generic equivalent metoclopramide did not adequately warn patients or their health care providers of the high risk of adverse side effects on prolonged or high dosage use of Reglan or metoclopramide.

After the *Mensing* Court decided that state tort liability claims based on the failure to provide adequate warning labels (similar to those here) were preempted under the Supremacy Clause, counsel for Appellee and the other plaintiffs again amended their master complaint. The post-*Mensing* amended complaint presents nine counts pertinent to our review, asserting strict liability for failure to give adequate warnings; strict liability for design defect; negligence (in testing, manufacture, distribution and effective warning); negligence *per se* (alleging failure to exercise reasonable care under "applicable statutes or regulations" and failure "to perform proper pharmacovigilance");

---

1. The *Bartlett* Court further explained:

> As *PLIVA* made clear, federal law prevents generic drug manufacturers from changing their labels. *See* 564 U.S. at ——, 131 S.Ct. at 2577 ("Federal drug regulations, as interpreted by the FDA, prevented the Manufacturers from independently changing their generic drugs' safety labels"). *See also* 21 U.S.C. § 355(j)(2)(A)(v) ("[T]he labeling proposed for the new drug is the same as the labeling approved for the [ap-
> proved brand-name] drug"); 21 C.F.R. §§ 314.94(a)(8)(iii), 314.150(b)(10) (approval for a generic drug may be withdrawn if the generic drug's label "is no longer consistent with that for [the brand-name] drug"). Thus, federal law prohibited Mutual from taking the remedial action required to avoid liability under New Hampshire law.

*Bartlett, supra* at 2476.

fraud, misrepresentation, and suppression; constructive fraud (asserting knowing assent and passive cooperation by generic manufacturers in brand name defendants' misrepresentations); breach of express and implied warranties; unfair and deceptive trade practices; and civil conspiracy. (*See* Plaintiffs' Third Amended Master Long Form Complaint, 8/03/11, at 50–77).

Preliminarily, as recognized by the learned Majority, Appellee's argument that Appellants, generic drug manufacturers, could have simply stopped selling was rejected by the United States Supreme Court in *Bartlett.* (*See* Majority at 213 n.8); *see also Bartlett, supra* at 2470 ("Rather, adopting the . . . stop-selling rationale would render impossibility preemption a dead letter and work a revolution in this Court's pre-emption case law.").

It is also important to note that the *Mensing* Court decided that the federal duty of sameness (generic drug labeling must be same as reference listed drug labeling), make it impossible for generic drug manufacturers to strengthen the warnings on drug labels, even assuming they are required to do so under state law. *See Mensing* at 2574–75, 2577. It is because of this impossibility that the *Mensing* Court concluded that the state law claims at issue (assumed to require strengthened warning labels) conflicted with the federal regulatory scheme for generic drugs and under the Supremacy Clause were preempted.

Here, the learned Majority holds that "only pre-[FDAAA] Act failure-to-warn claims based solely on a label that was in conformity with the RLD label are preempted under *Mensing.*" (Majority, at 217). It affirms the trial court's order for all other claims. (*See id.* at 216–17).

In effect, the Majority "carves out" a sub-category of claims presumed not to be preempted under *Mensing* or *Bartlett,* or as to which pre-emption is "premature." (Majority, at 217). The Majority arrives at this result by a circuitous route. It largely ignores the impossibility analysis which is at the core of both *Mensing* and *Bartlett.* Instead, it relies on derived analogies from other cases addressing liability for cigarettes, pesticide manufacture, even improper scheduling of Congressional elections, without reference to the abbreviated procedures and specific restrictions placed on manufacturers under the federal regulatory scheme for generic drugs.

Problematically, in my view, the Majority misinterprets the authority on which it relies. For example, the Majority cites *Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986) for the proposition that "pre-emption was no impediment to the pursuit in an Ohio state court of presumptive negligence claims based on misbranding of a drug in violation of the FDCA where there was no private cause of action for the violation." (Majority, at 216) (without pinpoint citation).

More specifically, the *Merrell Dow* Court affirmed the decision of the Court of Appeals for the Sixth Circuit, reversing a grant of removal to federal court. The Supreme Court concluded that "a complaint alleging a violation of a federal statute [FDCA] as an element of a state cause of action, when Congress has determined that there should be no private, federal cause of action for the violation, does not state a claim 'arising under the Constitution, laws, or treaties of the United States.'" (citing 28 U.S.C. § 1331). *Merrell Dow, supra* at 817, 106 S.Ct. 3229. Put simply, this is a removal case. The issue of whether the plaintiffs had a state cause of action was not before the Supreme Court, and the Supreme Court did not address it.

Similarly, the Majority invokes *Wyeth v. Levine,* 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009), in support of its conclusions. (*See* Majority, at 210, 212–13). This reliance overlooks the distinction, apparent from the facts, and plainly drawn in *Mensing,* between a brand name drug manufacturer's ability to change its warning label and that of a generic drug manufacturer: "The federal statutes and regulations that apply to brand-name drug manufacturers differ, by Congress' design, from those applicable to generic drug manufacturers. And different federal statutes and regulations may, as here, lead to different pre-emption results." *Mensing, supra* at 2571.

Additionally, the learned Majority quotes the *Bartlett* Court's reservation of the question of **absolute** liability pre-emption analysis (*see* Majority, at 211), but then, in my opinion, misapplies it to **strict** product liability design defect claims, ignoring the distinction made by the *Bartlett* Court, (*id.* at 212–13). *See Bartlett, supra* at 2474 n. 1.

Curiously, while taking Appellants to task for failing to provide state-specific pre-emption issues analysis, (*see* Majority at 212), the Majority offers virtually no state statutory or caselaw, whether Pennsylvania, Delaware or otherwise, (other than a reference to the Restatement), in support of its conclusion that Appellees have presented allegations of state law tort claims which survive preemption.[2]

In my view, the over-arching defect of the learned Majority's analysis is that no amount of eclectic exegesis will change the reality that where Congress has enacted legislation for the federal regulation of generic drug manufacturers, claims derived from a failure to warn, however framed or reframed, are preempted. During the time period of the allegations, it would have been impossible to comply with the federal duty of sameness and an assumed state-law based duty to alter the warning label, or distribute some divergent warning in derogation of the required label, on a unilateral basis. The claims are preempted under the Supremacy Clause, *Mensing,* and *Bartlett.* The trial court erred in overruling the preliminary objections.

Furthermore, from my review, it is apparent that all of Appellee's relevant allegations of state law tort liability depend on a failure to warn, or to give adequate warning, or otherwise communicate, however denominated, the perceived risks of taking metoclopramide. Under controlling authority, Appellants could not be liable for "defective design" of the generic drug itself. As approved manufacturers of a generic equivalent, Appellants had no duty, and indeed, based on the federal duty of "sameness" were prohibited from altering the "design" or pharmaceutical formulation of the generic drug from the RLD (reference listed drug). The Majority recognizes that the *Bartlett* Court held that because federal law prohibited Mutual, the generic drug manufacturer, from taking the remedial action required to avoid liability under New Hampshire law (redesign of reference listed drug, redesign of drug label), the state law was preempted. (*See* Majority, at 211); *see also Bartlett, supra* at 2476.

Therefore, in my opinion, Appellee's assertions of fraud, negligence *per se,* failure

---

**2.** Notably, the Majority appears to assume a cause of action here in "absolute liability" for the sale of an unreasonably dangerous product under Restatement (Second) Torts § 402A, comment f (1965). (Majority at 212). However, the Majority fails to address comment k, Unavoidably unsafe products, which creates an exemption, under specified conditions, from 402A strict liability for drugs. *See* Restatement (Second) Torts § 402A, comment k (1965).

to communicate, and so on, for purposes of this action, could only refer to some variation of the duty to provide an adequate warning label, or some purported substitute, claims preempted by the federal regulatory scheme for generic drug manufacturers.[3] (*See* Appellee's Brief, at 41).

"[P]re-emption analysis should not involve speculation about ways in which federal agency and third-party actions could potentially reconcile federal duties with conflicting state duties. When the 'ordinary meaning' of federal law blocks a private party from independently accomplishing what state law requires, that party has established pre-emption." *Mensing, supra* at 2580 (internal quotation marks in original).

The learned Majority correctly notes that this Court is not bound by the decisions of other jurisdictions. (*See* Majority, at 211). However, the Majority further chooses to disregard—even for their persuasive value—the overwhelming majority of decisions of other courts, both state and federal, which have held that state-law based claims, similar or identical to those alleged here, are preempted by the federal scheme of regulation for generic drugs under *Mensing,* and now, *Bartlett.*

"The dreadful injuries from which products liabilities cases arise often engender passionate responses. Today is no exception[.] But sympathy for [the appellee] does not relieve us of the responsibility of following the law." *Bartlett, supra* at 2478.

I would vacate the trial court's order and remand with instructions to sustain Appellants' preliminary objections.

Accordingly, I concur in part and respectfully dissent in part.

---

**3.** In particular, as recognized by the Majority, Appellee's argument that generic drug manufacturers could have met state law requirements to provide stronger warnings by sending so-called "Dear Doctor" letters to health care providers was expressly rejected in *Mensing, supra* at 2576. (*See* Majority, at 207).